UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MELODY A. COSTER,                                         CV 09-3009-AC

                Plaintiff,                          OPINION AND
                                                                      ORDER

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.
_____

ACOSTA, Magistrate Judge:

      Claimant Melody A. Coster ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") payments under Title II and Title XVI

of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 401-433 (2008). This court has jurisdiction

to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review

of the record, and for the reasons set forth below, the Commissioner's decision is affirmed.

*Background*

I.     Facts

Claimant is currently 55 years old.  She completed high school.  (Tr. 263.)  From August

1987 to September 1996, Claimant worked at Royal Gardens Health Care in food service.  (Tr. 109;

263.)  From September 1996 to July 1997, Claimant worked as a food service worker for Three

Rivers School District.  (Tr. 263.)  In July 1997, Claimant worked for Electronics Sub Assembly

Manufacturing ("ESAM") as an assembler.  (Tr. 109; 263.)  She worked there until May 1998.  (Tr.

109.)  She worked as a production worker at a manufacturing plant from November 2000 to June

2001.  (Tr. 109.)  In October 2001, Claimant did clean up work with a temporary agency.  (Tr. 109.)

In February 2002, she worked as a caregiver at an assisted living facility.  (Tr. 109.)  In May 2002,

Claimant worked as a machine press operator at Barrett Business Services and as a production

worker at Plastic Mold Injection Company.  (Tr. 109.)  She worked for Oak Lane Assisted Living

Facility as a caregiver in October 2002 until December 2002.  (Tr. 109; 263.)  From December 2002

until February 2003, Claimant made furniture with Master Brand Furnishing.  (Tr. 109; 263.)  She

worked at Oak Lake Retirement Center from February 2003 to August 2003.  (Tr. 109; 263.)

Claimant last worked for Rosetta Senior Living in Grants Pass, Oregon.  (Tr. 109; 263.)  She worked

there from September 2003 to January 2005.  (Tr. 109; 263.)

Claimant alleges disability based on carpel tunnel syndrome ("CTS") in both her left and

right hands, low back and hip pain, diabetes, high blood pressure, hypertension, migraine and non-

migraine headaches, episodes of syncope and dizziness, obesity, chronic skin sores, depression,

bipolar disorder, personality disorder, and pain and limitations resulting from the combination of

these disorders.

II.    Medical Evidence

On April 26, 2001, Claimant had surgery to address CTS in her right hand.  (Tr. 183.)
Claimant had a second surgery on May 24, 2001, to address CTS in her left hand.  (Tr. 170.)  At the
time of both surgeries, Claimant worked in production at Southern Electronics Manufacturing Plant.
(Tr. 109; 357.)  Claimant testified at the administrative hearing that "in . . . electronics manufacturing
you're handling fine wires," and that following her surgeries there were "no problems with [her]
hands."  (Tr. 358.)  Claimant testified that she "was laid off there because they lost a lot of contracts,
and [she] just happened to be one of the ones that went . . . ."  (Tr. 358.)

The record indicates that Claimant filed a worker's compensation claim in 2003.  The Saif
Corporation accepted the claim  on April 29, 2003 for left shoulder strain, left elbow abrasion and
left knee contusion.[1]  (Tr. 86.)  The claim was classified as "non-disabling" because "time-loss
benefits [were] not due nor [was] there an expectation permanent disability [would] result."  (Tr. 86.)
Dr. Timothy L. Wilson ("Dr. Wilson") restricted Claimant to modified duty on April 30, 2003.  (Tr.
203.)  Claimant was limited to lifting, carrying, pushing, and pulling twenty pounds.  (Tr. 203.)  Dr.
Wilson restored Claimant to full duty without limitations on May 5, 2003.  (Tr. 202.)

On June 11, 2003, while working at Oak Lake Retirement Center, Claimant strained a lower
back muscle while transferring a resident to the shower.  (Tr. 87.)  She filed a worker's compensation
claim which was accepted by the Saif Corporation as a "non-disabling" lumbar strain on July 3,
2003.  (Tr. 80.)  Dr. Rebecca Miller ("Dr. Miller") placed Claimant on modified duty from June 16,
2003, to June 27, 2003.  (Tr. 201.)  Claimant was restricted to occasionally lifting, carrying, pushing,
and pulling twenty pounds.  (Tr. 201.)  She was restricted to stooping and bending one to five

---

[1]SAIF Claim 7918010F

percent of the day, and twisting, pushing, and pulling six to thirty-three percent of the day. (Tr. 201.)
From June 27, 2003 to July 10, 2003, Claimant's modified duty limitations improved to occasionally
lifting, carrying, pushing, and pulling twenty-five pounds, and stooping, bending, crouching, pushing
and pulling six to thirty-three percent of the day. (Tr. 200.) From July 10, 2003, to July 24, 2003,
Claimant's modified duty limitations improved to thirty-five pounds. (Tr. 199.) Throughout
Claimant's period of modified duty, there were no limitations placed on her ability to stand, walk,
or sit. (Tr. 199-201.) In August 2004, Dr. Miller opined that Claimant's sciatica was resolved and
noted that "[s]he is essentially doing full duty at this point, though she is being careful at work." (Tr.
193.) Although Claimant experienced some discomfort at the end of the day, she required no pain
medication. (Tr. 193.)

On September 7, 2004, co-workers heard Claimant fall. (Tr. 219.) When they got to her, she
was confused, complaining of headache, and vomiting. (Tr. 219.) Claimant was taken to the
Emergency Department at Three Rivers Community Hospital. (Tr. 219.) Claimant stated that she
had diabetes but was not taking her medication because she could not afford to do so. (Tr. 219.) Dr.
Barbra Villona reported:

> Patient's course was very complicated. It is entirely possible that she simply had
> vertigo which led to [sic] these symptoms, but I am concerned that she could have had
> something much more serious. I have no evidence that she has an intracranial
> infection or other intracranial event. She does not appear to be septic, and over her
> time in the emergency department, she improved dramatically and actually looked
> to be quite well and completely nontoxic at the time of discharge. I . . . explained
> again to her why I felt it was so very important that she be placed on medication for
> her diabetes, and she has assured me she will follow up with Dr. Gleffe.

(Tr. 220.)

Claimant saw her primary care physician Dr. Dan Gleffe ("Dr. Gleffe") on November 8,

OPINION AND ORDER                          4                              {LNP}

2004.  (Tr. 206.)  She advised that "[l]ately she's felt somewhat depressed due to the amount of stress she's under, she takes care of a handicapped niece. [She] [i]s also working full time."  (Tr. 206.)

Claimant filed for disability benefits on February 15, 2005.  (Tr. 101.)  At that time, she alleged disability based on CTS, sciatic nerve damage, degenerative arthritis, loss of arm strength, and chest wall pain mimicking heart attacks.  (Tr. 80.)  In her function report, Claimant stated that she is unable to lift over ten pounds.  (Tr. 101.)  She reported spending a lot of time on the couch resting when the pain becomes too much, which occurs almost daily.  (Tr. 101.)  She reported that she is not caring for anyone else, but that she cares for one cat.  (Tr. 102.)  Claimant indicated that her conditions prohibit her from walking great distances, climbing stairs, sitting for too long, or working with her hands.  (Tr. 102.)  She is able to do laundry and can do light cleaning.  (Tr. 103.)  Claimant visits with others in person, talks with others on the telephone, or chats with them on the computer.  (Tr. 105.)  She stated that she does not need to be reminded to go places.  (Tr. 105.)  She explained that her attention span varies based on how she is feeling at the time and that she can follow spoken instructions to the best of her ability.  (Tr. 106; 108.)

The Disability Quality Branch determined that updated medical evaluations were necessary to decide Claimant's case.  (Tr. 243.)  During this time, claimant moved to New York to live with her brother and sister-in-law.  (Tr. 352.)  The Division of Disability Determination referred Claimant to Dr. Amelita Balagtas ("Dr. Balagtas") of Industrial Medicine Associates in Albany, New York. (Tr. 245.)  Dr. Balagtas reported that "[b]ased on today's evaluation, the Claimant would have some limitations in activities that require bending, lifting, prolonged sitting, and prolonged standing and walking."  (Tr. 247.)  On July 9, 2005, Dr. Bruce Rockwell of Jamestown Radiologists, P.C. found

that Claimant had "mild to moderate multilevel degenerative changes."  (Tr. 248.)

Claimant's disability benefits claim was rejected July 22, 2005.  (Tr. 41.)  Claimant filed a request for reconsideration on July 27, 2005.  (Tr. 46.) She stated that her existing medical issues make it "impossible for [her] to do the job(s) [she] performed in the past pertaining to the daily care of the elderly." (Tr. 46.)  On August 9, 2005, Claimant completed a Disability Report Appeal form. (Tr. 134-40.)  She advised that since she last completed a disability report, her back and hip joint pain were getting progressively worse, and that she had more frequent back spasms which lasted more than one day.  (Tr. 134.)  In addition to the conditions Claimant alleged previously, she complained of depression and thoughts of suicide.  (Tr. 134.)

John Small ("Small"), a Licensed Independent Social Worker, assessed Claimant on August 9, 2005, in response to her depression claims.  Small reported the following:

> Client becomes irritable and angry.  She has some suicidal thinking, but she states she probably would not follow through because of her friend and her religious beliefs.  She is Episcopalian.  She said if she did commit suicide, it would be by an overdose, and she would go to a place where nobody would find her.  Client does not have a history of suicidal attempts.

(Tr. 259.)  Small diagnosed Claimant with "Bipolar Diagnosis, mixed" and referred her to "individual counseling and to see psychiatry [sic]."  (Tr. 260.)  Around this time, Claimant began having problems with her brother and sister-in-law.  (Tr. 353.)

On September 30, 2005, at the request of the Ohio Rehabilitation Services Commission, Bureau of Disability Determination, Dr. Karen Robie, Ph.D ("Dr. Robie") evaluated Claimant's mental status.  (Tr. 262.)  Dr. Robie opined that "based on information available during this evaluation, [Claimant's] mental health prognosis . . . [is] guarded." (Tr. 265.) Dr. Robie noted that Claimant was not participating in treatment and "would benefit from psychotherapeutic and

pharmaceutical intervention." (Tr. 265.) Dr. Robie gave Claimant a Global Assessment of

Functioning score ("GAF") of 53. (Tr. 265.)

On October 11, 2005, Harbor Behavioral Healthcare clinician Wendy Bauer ("Bauer")

evaluated Claimant. Bauer reported:

> Melody was casually dressed. She had a few blisters on her mouth. She was very
> congested. She had a flat affect. Minimal eye contact. She was underlinely [sic]
> frustrated and depressed. Her speech was appropriate to contact. Her content
> focused much on herself and what she was going to do to get better and how she was
> going to survive here in Toledo even though she didn't know very many people. She
> talked about having suicidal ideation but denied any plans especially since that was
> against her religion. Her thought process were coherent. Her orientation was X 3.
> Her judgment was somewhat limited. Her insight was poor. Her recent and remote
> memory was limited regarding past problems with her depression and has problems
> with medication. She does say that sometimes she does hear voices. She said they
> tell her to go to bed and to take her pills. She denies visual hallucinations.

(Tr. 255.) Bauer assessed Claimant's GAF at 45.[2] (Tr. 256.)

On September 1, 2007, in preparation for her hearing before the Administrative Law Judge

("ALJ"), Claimant prepared a list of her disabling conditions. (Tr. 326.) She reported that she

constantly picks sores on her skin in response to stress causing them to bleed and not heal properly.

(Tr. 327.) She has a nervous condition that aggravates her daily living. (Tr. 327.) She cannot deal

with co-workers or supervisors and she becomes confrontational and negative. (Tr. 327.) She has

mood swings that severely affect her daily "outlook." (Tr. 327.) She suffers from back and hand

pain. (Tr. 327.) She experiences blackouts resulting in "disturbing memory loss." (Tr. 327.) She

has nightly panic attacks fifteen to twenty times a month raising her stress and panic levels. (Tr.

328.)

Claimant reported having trouble managing her diabetes and hypertension resulting in

---

[2] Bauer's report is neither signed nor dated.

headaches and moments of feeling faint. (Tr. 329.) She does not sleep enough resulting in restlessness and irritability. (Tr. 329.) She has trouble concentrating or making simple decisions. (Tr. 329.) She noted that she repeats tasks as much as ten to fifteen times because of a "morbid fear that [she] didn't do it right the first time." (Tr. 329.) Her daily function "is obstructed by things [she] perceive[s] as insurmountable." (Tr. 329.) She explained that it is harder for her "communicate/express [her]self on an everyday level, [that she] think[s] one thing, say[s] something entirely different, [and] at times ramble[s] on and talk[s] excessively." (Tr. 329.)

Claimant reported that she has short- to mid-term memory loss and at times has trouble remembering things that took place only minutes prior. (Tr. 330.) She has comprehension problems which require her to take notes at work. (Tr. 330.) She notes that she completely forgets things and is often unaware of this until it is brought to her attention. (Tr. 330.) She fatigues easily and needs to rest constantly regardless of the task. (Tr. 330.) She concluded her self-assessment by noting, "I feel that my functioning in everyday life (work and my interactions with family and friends) is suffering because of the issues stated above, even at times pointing me to thoughts of suicide." (Tr. 330.)

III.    Vocational Evidence

The Vocational Expert ("VE") attended and testified at the administrative hearing. (Tr. 359.) She classified Claimant's past relevant work as medium semiskilled (care-giver); light unskilled (finish sander, injection molding machine operator, machine press operator, production worker, and small products assembler); and medium unskilled (kitchen helper and janitor). (Tr. 360-61.) At hearing, the ALJ posed the following hypothetical:

> I'd like you to consider a hypothetical individual. She is 52. She had a high school
> education and work as [the Claimant]. She is limited to lifting and carrying more

than ten pounds frequently with an occasional twenty pound maximum. She can sit, stand or walk at least six hours each in an eight-hour day. She is unable to climb ladders or use scaffolding. She is limited to occasional stair climbing, ramp negotiation, stooping, crouching and crawling. She needs to avoid dangerous hazards like unprotected heights or other falling hazards as well as dangerous machinery. She is unable to consistently follow complex or detailed instructions. She is unable to interact predictably appropriately with the public. She is unable to predictably engage in ongoing cooperative teamwork endeavors.

(Tr. 361.) The VE testified that an individual with the limitations specified by the ALJ could not work as a caregiver, sander, kitchen helper, janitor, press operator, production worker, or molding machine operator. (Tr. 361-62.) However, the individual could work as a small products assembler. (Tr. 362.) The VE then testified that there were other jobs in the national and regional economy that the hypothetical individual could perform, namely mail clerk and basket filler. (Tr. 362.)

Claimant's attorney questioned the VE and asked her to evaluate the hypothetical individual's work options if, instead of "light," the individual was restricted to "sedentary" work. (Tr. 362.) The VE testified that the small products assembler position would be eliminated, but potential other work would include bench hand, jewelry and silverware maker, and optical goods assembler. (Tr. 363.) Claimant's attorney added "no frequent use of the hands" as an additional element of the ALJ's original hypothetical. (Tr. 364.) The VE testified that if the hypothetical individual was prohibited from frequent use of the hands, all of the jobs listed previously would be eliminated. (Tr. 364.)

*Procedural History*

Claimant protectively filed for DIB and SSI on January 14, 2005, alleging a disability onset date of January 8, 2005. The claim was denied initially and on reconsideration. On September 13, 2007, a hearing was held before an ALJ, who issued a decision on October 12, 2007, finding Claimant not disabled. Claimant requested review of this decision on November 26, 2007. The Appeals Council denied this request, making the ALJ's decision the Commissioner's final decision.

Claimant filed for review of the final decision in this court on February 5, 2009.

*Standard of Review*

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (explaining that the "decision to deny benefits will be disturbed only if it is not supported by substantial evidence or is based on legal error."). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Andrews*, 53 F.3d at 1039-1040. The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

When considering a claimant's testimony that his or her pain, or other symptoms, precludes work activity, the ALJ is required to conduct a two-step analysis. *Wright v. Astrue*, No. 08-6161, 2009 WL 2827576, at * 8 (Aug. 24, 2009). First, the ALJ must determine whether the claimant has presented substantial evidence showing that he or she has an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the pain or symptoms alleged. If the first step is satisfied, the ALJ must next engage in a credibility analysis of the claimant's subjective pain testimony. *Id.* The ALJ may not, however, reject the claimant's statements concerning his or her pain or limitations merely because they are not supported by

objective medical evidence. *Id.* (citing *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain. *Id.* at *9 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). Where there is no evidence of malingering, these findings must be clear and convincing. *Id.* (citing *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004)).

In addition to determining the claimant's credibility, the ALJ is responsible for resolving conflicts in medical testimony, and resolving ambiguities, if necessary. *Andrews*, 53 F.3d at 1039. An ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883 (citing SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Smolen v. Charter*, 80 F.3d 1273, 1281 (9th Cir. 1996)).

### Summary of the ALJ's Findings

The ALJ engaged in a five-step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.    Step One

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of her alleged disability. (Tr. 28.)

//

II.    Step Two

At Step Two, the ALJ determined that Claimant had the following impairments: degenerative disc disease of the lumbar spine with scoliosis and antrolisthesis, diabetes mellitus, hypertension, history of syncope, obesity, depression, and personality disorder. (Tr. 29.) The ALJ concluded Claimant "has a severe impairment." (Tr. 29.) He also found that while Claimant mentioned CTS, it had been successfully treated and was non-severe. (Tr. 29.)

III.    Step Three

At Step Three, the ALJ concluded that "[C]laimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 29.) In particular, the ALJ considered the listings for Affective Disorders, 12.04, and Personality Disorders, 12.08. (Tr. 29.) The ALJ cited Claimant's statements to Dr. Robie regarding her daily living restrictions, social functioning, and concentration, persistence, or pace. (Tr. 29.) Based on Claimant's report to Dr. Robie, the ALJ concluded that Claimant had only mild restriction in her ability to carry out daily living activities; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation. (Tr. 29-30.)

IV.    Claimant's RFC

In determining Claimant's RFC, the ALJ concluded that Claimant was able:

> to lift and carry ten pounds frequently and twenty pounds occasionally; she can sit, stand, or walk six hours each in an eight hour workday; she is limited to stair climbing or ramp negotiation, stooping, crouching, or crawling; she cannot climb ladders or use scaffolds; and she should avoid dangerous hazards such as unprotected heights, other falling hazards, and dangerous machinery.

(Tr. 30.) As for non-exertional limitations, the ALJ concluded: "claimant is also unable to consistently follow complex or detailed instructions; she is unable to interact predictably in an appropriate manner with the general public; and she is unable to predictably engage in ongoing, cooperative, teamwork endeavors." (Tr. 30.)

The ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 31.) Claimant alleged many health-related reasons why she could not work, namely CTS; back, hip, and shoulder pain; sciatic nerve damage; degenerative arthritis; loss of strength in the arms; chest wall pain; and mimicking heart attacks. (Tr. 31.) However, the ALJ concluded that Claimant's stated symptoms were not fully supported by objective evidence and so the ALJ proceeded to evaluate Claimant's credibility. (Tr. 31.)

First, the ALJ found that the lack of medical treatment and evidence of Claimant's repeated relocations in the record undermined Claimant's credibility. (Tr. 35.) On January 10, 2005, two days after the onset of Claimant's alleged disability, Claimant saw Dr. Gleffe regarding diabetes treatment. (Tr. 32.) There were no medical records until six months later when Claimant reported to Dr. Balagtas. Claimant had since relocated to New York and a consultative orthopedic examination was requested by Disability Determination Services of New York. (Tr. 32.) Within a month, Claimant again relocated, this time to Ohio. (Tr. 32.) On August 9, 2005, Claimant participated in a diagnostic assessment with Small. (Tr. 32.) The ALJ noted that Small "recommended individual therapy sessions for the [C]laimant [but] [t]here [wa]s no indication that the claimant followed through with the recommended treatment." (Tr. 33.) According to Claimant,

she did not pursue treatment of conditions because she was financially unable to do so.  (Tr. 35.)  However, the ALJ noted that Community Health Center offered to help Claimant obtain medication at a reduced cost and she rejected the request.  (Tr. 35.)  Further, the ALJ noted that Claimant "managed to travel back from Ohio to Oregon, which implies some travel costs."  (Tr. 36.)

Second,  the ALJ summarized the record evidence that undermined Claimant's inability to work.  The ALJ, in recounting Claimant's report to Dr. Robie, indicated that while at least two of Claimant's jobs ended due to problems interacting with others at work, those at Oak Lake Retirement and Royal Gardens Health Care, Claimant's other jobs ended for different reasons.  (Tr. 33.)  The ALJ stated: "The [C]laimant reported that she was terminated from Master Brand Furnishing because she was not up to 'par.'  She left an electric manufacturing job, ESAM, because she went to help her mother.  She worked for the Three Rivers School District, but left for the job opportunity with ESAM."  (Tr. 33.)

Finally,  the ALJ determined that "[t]he level of severity of the claimant's symptoms [was] not supported in the record."  (Tr. 36.).  First, in her mental status examination with Dr. Robie, Claimant reported having problems with racing thoughts, poor concentration, and memory. (Tr. 33.)  However, Dr. Robie found that the Claimant had no impairment in her ability to understand and follow instructions and she was not impaired in her ability to maintain attention to perform simple, repetitive tasks.  (Tr. 34.) On October 11, 2005, Claimant underwent a psychiatric consultation with Bauer.[3]  (Tr. 34.)  Claimant reported that she thought she might have a broken hip, but according to the ALJ, "Ms. Bauer noted that the [C]laimant walked 'extremely well.'"  (Tr. 34.)  Lastly, the Claimant reported that sometimes she heard voices, yet the ALJ noted that "the references to 'voices'

_____

[3] Bauer's credentials are not identified in the record.  The ALJ determined that "Ms. Bauer's opinion is considered an 'other source' as defined under 20 CFR 404.1513(d)."  (Tr. 32.)

was not repeated elsewhere, and whatever prompted the claimant to make that report apparently did not persist." (Tr. 35.) For all of these reasons, the ALJ concluded that Claimant was not fully credible.

## V.    Step Four

At Step Four, the ALJ concluded that Claimant was capable of performing past relevant work as a small product assembler. (Tr. 36.)

## VI.    Step Five

In determining that Claimant could perform past relevant work as a small product assembler, the ALJ found Claimant not disabled at Step Four. (Tr. 37.) Nevertheless, the ALJ proceeded to Step Five. (Tr. 37.) At Step Five, the ALJ concluded that Claimant was capable of performing other work that exists in significant numbers in the national economy. (Tr. 38.) The ALJ cited VE testimony that a hypothetical individual with Claimant's limitations could perform such "light work" jobs as a mail clerk and basket filler, or such "sedentary" jobs as a bench hand for jewelry and silverware and as an assembler for optical goods. (Tr. 37-38.) In light of the above, the ALJ found Claimant not disabled. (Tr. 38.)

*Discussion*

Claimant argues that the ALJ erred in the following ways: (1) incorrectly applying the Medical-Vocational Guidelines (also known as the "grids") listed at 20 C.F.R. Part 404, Subpart P, Appendix 2; (2) failing to fully credit Bauer's opinion; (3) failing to find Claimant fully credible; (4) substituting his own opinion for that of Claimant's treating and examining medical sources and, in doing so, making his own independent medical findings from the medical evidence; (5) failing to consider the combined effect of Claimant's multiple impairments; and (6) basing his decision on the

flawed opinion of the VE. Claimant alleges the fourth, fifth, and sixth arguments without explanation. For the reasons that follow, the Commissioner's decision denying Claimant's request for DIB and SSI is affirmed.

I.    The ALJ's Application of the Medical-Vocational Guidelines

Claimant contends that the ALJ erred in applying Rule 202.14 instead of Rule 201.14 of the Medical-Vocational Guidelines. Claimant argues that had her additional limitations been considered, Rule 201.14 would have required a finding that Claimant is disabled. The court need not reach this argument, because Claimant was found "not disabled" at Step Four and these guidelines are applicable only at Step Five of the evaluation. The ALJ concluded that Claimant was capable of performing past relevant work as a small product assembler and was, therefore, not disabled. The ALJ was not required to proceed to Step Five  but did so because "the vocational expert also identified other jobs existing in the national economy that [Claimant] is able to perform." (Tr. 37.) Because this was not necessary and Claimant's case resolved at Step Four, the court need not address whether the Medical-Vocational guideline applied at Step Five was appropriate.

II.    Bauer's Opinion

Claimant contends that Bauer is a psychiatrist and that the ALJ erred in rejecting her opinions and ultimate conclusions as those of an "other source" under 20 C.F.R. §§ 404.1513(d) and 416.913(d). Claimant bases this argument on evidence in the record that Claimant reported to Bauer following a referral from Small to "psychiatry" for a "psychiatric evaluation." (Tr. 260.) According to Claimant, "[t]his, and the fact that Wendy Bauer prescribed both Risperdal and Lexapro, indicate that clinician Wendy Bauer . . . was indeed a psychiatrist." (Pl.'s Br. 16.) The court finds this reasoning flawed.

Under the SSA, sources authorized to provide medical conclusions include licensed physicians, licensed or certified psychologists,[4] licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). A person classified as an "other source" is authorized to provide evidence on the severity of a claimant's impairments and how such impairments affect his or her ability to work. 20 C.F.R. § 404.1513(d).

> Other sources include, but are not limited to (1) Medical sources not listed in [20 C.F.R. 404.1513(a)] (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists); (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

The record lacks any evidence to suggest that Bauer is a licensed psychiatrist. Bauer's report is unsigned and does not use the title "Dr." or "M.D." to specify her credentials. Furthermore, neither Bauer's ability to prescribe medication nor the fact that Claimant was referred for a psychiatric evaluation are sufficient to prove that Bauer was, indeed, a physician. There is no evidence in the record sufficient to establish that Bauer was licensed or held any credentials for psychiatry. Where the record is unclear, the ALJ is responsible for resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Thus, absent evidence to the contrary, it was within the ALJ's discretion to conclude Bauer is not a psychiatrist. Thus, the ALJ did not err in evaluating

---

[4] Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only. 20 C.F.R. §404.1513(a)(2).

Bauer's opinion as an "other source."

Claimant argues that even if Bauer is not a psychiatrist, her opinion should be given more weight. Claimant contends the ALJ erred in giving no weight to "Bauer's bipolar diagnosis and the GAF score[.]" (Tr. 35.) The ALJ reasoned that, because Bauer qualified as an "other source," her opinion alone "[could not] establish the existence of a medically determinable impairment." (Tr. 34.) The ALJ explained that Bauer's conclusions were given no weight because they appeared to be based on an inconsistent presentation by Claimant.

The ALJ noted that in her consultation with Bauer, Claimant stated that she may have a broken hip. With regard to Claimant's hip, Bauer wrote: "[S]he also talks about the possibility that she might have a broken hip, however she seems to walk extremely well if in fact that is true." (Tr. 254.) And, as the ALJ noted, Claimant also reported hearing voices, a complaint that was not made elsewhere in the record. This prompted the ALJ to conclude that Bauer's findings were not supported by the balance of the record evidence, and may have been the result of an inconsistent report by Claimant. Thus, the ALJ's conclusion was based upon proper legal standards and substantial record evidence and will not be disturbed.

For the reasons stated above, the court concludes the ALJ gave Bauer proper consideration.

III.    Claimant's Credibility

Claimant asserts that the ALJ improperly analyzed her credibility. The ALJ stated that although Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," her testimony as to "the intensity, persistence and limiting effects of these symptoms [were] not entirely credible. (Tr. 31.) "Once a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints

based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)) (internal quotation marks omitted). If the ALJ finds the subjective complaints less than credible, the ALJ must make specific findings that support that conclusion. "[T]he findings 'must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit [the] claimant's testimony." *Id.* at 856-57 (quoting *Bunnell*, 947 F.2d at 345). In the absence of evidence that the claimant is malingering, the ALJ must give "clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms." *Id.* at 857 (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988)).

The ALJ gave several reasons why he found Claimant not fully credible with regard to the severity of her symptoms. First, the ALJ noted that Claimant, who stated that she had very little money, had rejected an offer of financial assistance in purchasing medication from the Community Health Center. The Community Health Center Progress Note in question states that the center is creative in "partnering" with clients to help them pay for their medication. Claimant was not interested in such assistance. The ALJ also noted that Claimant had relocated several times, suggesting that her financial condition was not as dire as reported.

Second, the ALJ observed that Claimant had only infrequently sought treatment for her claimed mental impairments. A failure to seek treatment is a legitimate consideration in evaluating a claimant's credibility. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Here, Claimant sought treatment for her mental condition only two times. Both instances occurred between August and October 2005, while Claimant was living in Ohio. Third, the ALJ also found Claimant less than

credible with regard to her ability to get along with others. Claimant reported that she was living with a friend, which the ALJ considered to be at odds with her claims that she has difficulty interacting with others and, in fact, suggested that she could get along with others.

Although there may be other rational interpretations of this evidence, the ALJ's credibility analysis is entitled to considerable weight. Where the record "evidence reasonably supports either confirming or reversing the ALJ's decision, [the court] may not substitute [its] judgment for that of the ALJ." *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Here, the ALJ gave specific reasons for questioning the credibility of Claimant supported by the record evidence and this determination is affirmed.

IV.    The ALJ's Findings and Inferences from the Medical Evidence

Claimant asserts, without supporting analysis, that the ALJ improperly substituted his own opinion for that of Claimant's treating and examining sources and made his own medical findings and inferences from the medical evidence. The court disagrees. The court's review of the record evidence reveals no support for Claimant's contention or for disturbing the ALJ's conclusion.

V.    The ALJ's Evaluation of Claimant's Multiple Impairments

Claimant argues the ALJ did not properly consider the combined effect of her multiple impairments and whether their combined effect would equal a disabling impairment. The record shows that the ALJ considered Claimant's degenerative disc disease of the lumbar spine with scoliosis and antrolisthesis, diabetes mellitus, hypertension, history of syncope, obesity, depression, and personality disorder. It appears, on the record before the court, that the ALJ properly considered all of Claimant's impairments and that the ALJ determined that such impairments did not qualify as disabilities under the SSA. This court cannot substitute its judgment for that of the

Commissioner.

## VI.    The ALJ's Reliance on the Vocational Expert's Testimony

Finally, Claimant argues the ALJ erred by basing his decision on the opinion of the VE.  As stated above, however, the ALJ found Claimant not disabled at Step Four.  Accordingly, the ALJ's Step Five analysis is not dispositive and the court need not address this issue further.

*Conclusion*

Based on the foregoing reasons, the Commissioner's decision denying plaintiff's request for disability benefits is AFFIRMED.

DATED this 22nd day of November, 2010.


_____ /s/ John V. Acosta _____

JOHN V. ACOSTA
United States Magistrate Judge